**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| **In re**<br><br>**ADAM J. LYNDS,**<br><br>        **Debtor**<br>————————————————<br>**JONATHAN KELLEY,**<br><br>        **Plaintiff**<br><br>**v.**<br><br>**ADAM J. LYNDS,**<br><br>        **Defendant** | **Chapter 7**<br>**Case No. 19-11359-FJB**<br><br><br><br>**Adversary Proceeding**<br>**No. 19-1091** |

<u>**MEMORANDUM OF DECISION**</u>

I.      **Overview**

        In this adversary proceeding, the plaintiff, Jonathan Kelley ("Kelley"), seeks a determination

that his prepetition judgment against the defendant and debtor, Adam J. Lynds ("Debtor"), for monies

loaned is excepted under 11 U.S.C. § 523(a)(2)(A) from the discharge he has received in this chapter 7

case.  That subsection excepts from the discharge any debt "for money, property, services, or an

extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false

representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A).  Kelley says that the debt in question, for

credit extended, was obtained by a false representation.

        The complaint is not a model of clarity.  It merely refers to § 523(a)(2)(A) and then attaches a

copy of a state court complaint and an execution in the hope that the court will discern the factual

predicate for Kelley's case.  Kelley appears to be relying on at least two and possibly three false

representations as grounds for excepting some or all of the judgment debt from discharge.  The first,

he contends, is that the Debtor represented to him, falsely, that he needed the loans in question for

expenses related to his divorce litigation and settlement; this was false, Kelley contends, because in fact the money was used for other purposes, such as to pay personal expenses, unpaid taxes, and gambling debts. The second, he contends, is that the Debtor failed to disclose to him that he owed substantial amounts in federal tax arrears; this was false, Kelley maintains, because it misrepresented the Debtor's financial condition. The third misrepresentation, which is not clearly pled but which I address for thoroughness' sake, is that the Debtor entered into the loans without intent to repay them, such that his promises of repayment were false promises.

At a trial held on January 25, 2021, Kelley called two witnesses, himself and the Debtor, and the parties by stipulation introduced six exhibits into evidence. The following constitute the Court's findings of fact and conclusions of law, required by Fed. R. Civ. P. 52(a)(1), made applicable by Fed. R. Bankr. P. 7052. On the basis thereof, the Court determines that Kelley has failed to carry his burden of establishing the requirements of nondischargeability under § 523(a)(2)(A) and, accordingly, will enter judgment for the Debtor.

II.      **Findings of Fact**

I find the following facts. When the parties met through a mutual friend in 2012 or 2013, the Debtor was working as a mortgage broker and Kelley as a banker. They soon became friends. During 2015, Kelley made two unsecured loans to the Debtor, the first in the amount of $100,000 ($40,000 of which the Debtor repaid in a lump sum) on July 15, 2015 and the second in the amount of $220,000 on or about November 24, 2015, for total advances of $320,000. On March 17, 2017, the parties entered a so-called loan agreement (the "Agreement"). To say the least, the Agreement's terms were unconventional. It provided that the principal of the loan would be repaid over a four-year period in a series of four lump-sum payments. What the parties characterized as interest was to be paid as follows: $2,080.37 each month to Kelley's first mortgage lender on his home and $780.44 each month to Kelley's second mortgage lender on his home. The Agreement went on to provide that if the loan amounts were not timely repaid "by the end of the four-year term," Kelley "will obtain the right to the

2

assets held by [the Debtor]," which included the Debtor's home and a second parcel of real estate. The Agreement also stated that the Debtor would obtain a ten-year term life insurance policy for which Kelley would be the primary beneficiary until the loan and interest payments were paid in full. There is no evidence that the Debtor ever provided a mortgage to any real estate, nor that he obtained any insurance policy.

On September 22, 2015, two months after Kelley made the first loan of $100,000 to the Debtor, the Debtor sent an email to Kelley proposing the additional loan of $220,000. Under the new financing, Kelley was to earn at least $130,000 over four years. In the email the Debtor stated that "my divorce is finally final and I need to come up with some cash in the next two months to pay my wife off." Kelley understood this to mean that the Debtor owed his ex-wife a lump sum that would end his divorce settlement. The Debtor testified that his divorce settlement, in fact, required him to make monthly $1,500 payments over 15 years to his ex-wife as a property division in addition the payments he was making for alimony and child support. The Debtor testified that his intent in borrowing money from Kelley was to pay off the property division in a lump sum. It is unclear from the record whether the Debtor completed that lump sum payment.

Both Kelley and the Debtor testified that several phone conversations took place between the September 22 email and the November 24 delivery of the second loan. The Debtor stated that those discussions did not include much about what he was going to do with the money. Kelley testified that he would not have delivered the second loan without a signed agreement, however, no such agreement was offered into evidence. The Debtor used the first $100,000 to pay his attorney's fees, child support, alimony, and some personal bills. He used the second loan to pay his ex-wife and to pay off some gambling debt. The Debtor forthrightly testified that his gambling became a problem at the end of 2015, around the time he received the second loan. The evidence shows that the Debtor was called into probate court on contempt for nonpayment within months of the divorce settlement being entered, and he remains in contempt to the present day.

3

When asked whether he took into consideration the Debtor's reason for needing the money in deciding whether to grant the loan, Kelley reiterated his understanding that the Debtor needed to come up with a lump sum to finalize his divorce.

The evidence establishes that the Debtor made substantial payments on the loans. He made a lump sum payment of $40,000 on July 15, 2016, and he made approximately 24 payments to Kelley's first mortgage lender or on account of that loan.

**III.     Conclusions of Law and Analysis**

It is axiomatic that exceptions to discharge are to be narrowly construed and that all genuine doubts should be resolved in favor of the debtor and against the creditor. In order to establish that a debt is excepted from discharge under § 523(a)(2)(A) due to false representation, the plaintiff must prove each of the following elements by a preponderance of the evidence:  "1) the debtor made a knowingly false representation or one made in reckless disregard of the truth; 2) the debtor intended to deceive; 3) the debtor intended to induce the creditor to rely upon the false statement; 4) the creditor actually relied upon the misrepresentation; 5) the creditor's reliance was justifiable; and 6) the reliance upon the false statement caused damage."  *McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir. 2001) (citing *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997)).  The first element, making a knowingly false representation, refers to the conduct of the debtor and can include a debtor's promise to act, "[i]f, at the time he made his promise, the debtor did not intend to perform[.]" *Id.* at 786-87.

The first element generally requires the debtor to make a false statement with knowledge of its falsity.  *Farley v. Romano (In re Romano)*, 353 B.R. 738, 767 (Bankr. D. Mass. 2006) (citing *Palmacci*, 121 F.3d at 786–787).  The second element, intent to deceive, refers to the Debtor's mental state and specifically requires a mental state embracing an intent to deceive, manipulate, or defraud.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976); *Palmacci*, 121 F.3d at 786-87.  Intent to deceive may be demonstrated by showing that "a false representation has been made . . . recklessly, careless of

4

whether it is true or false," or, in other words, with reckless disregard for the truth. *Palmacci*, 121 F.3d at 787 (citations omitted). "Availability of direct evidence to prove a debtor's intent to deceive a creditor is unlikely to be obtained. The court may infer fraudulent intent from the totality of circumstances." *Danvers Savings Bank v. Alexander*, 427 B.R. 183, 195 (Bankr. D. Mass 2010) (citing *Palmacci*, 121 F.3d at 789). Among the circumstances from which scienter may be inferred are the defendant's insolvency or some other reason to know that he cannot pay, his repudiation of the promise soon after made, or his failure even to attempt any performance. *Palmacci*, 121 F.3d at 789.

Kelley has not carried his burden of establishing that the Debtor made a knowing misrepresentation to him. First, I find that the Debtor never told Kelley that he needed to use the loan proceeds solely for expenses related to his divorce litigation and settlement. Surely, he did not do so in the September 22, 2015 email, and there is no mention of the use of the proceeds in the Agreement. Even if I found that the Debtor made a false representation to Kelley regarding his use of the money, I find that Kelley has failed to show that he relied on the Debtor's stated reason for needing the loans. Counsel argued in closing that but for the Debtor stating his intent to use the money for his divorce, Kelley would not have provided the loan. The evidence simply does not show that.

Second, as to the allegation that the Debtor failed to reveal that he had tax obligations when the loans were made, there is no evidence that Kelley asked the Debtor what his other obligations were at the time of the loans. Simple silence, a failure to disclose, can amount to a false representation that there is nothing to disclose when it is made in the face of an obligation to disclose, but here Kelley has adduced no evidence that the Debtor was asked to disclose any significant obligations he then faced, or that the Debtor was otherwise under an obligation to disclose the existence of his tax debt. There is no evidence or even allegation that Kelley required a personal financial statement from the Debtor or any other undertaking as to his financial condition. In the

5

circumstances, the Debtor's non-disclosure of his tax obligations was no representation at all, much less a false one.

Finally, I find that Kelley has not established that the Debtor took the loans without intent to repay them, that his promise of repayment was a misrepresentation of intent to repay. In fact, the Debtor made a lump sum payment of $40,000 on July 15, 2016, and he made approximately 24 payments to Kelley's first mortgage lender or on account of that loan. The large lump sum repayment followed by approximately two years of monthly payments are inconsistent with a finding that the Debtor did not intend to repay the loans from the start.

For these reasons, judgment shall enter dismissing the complaint on its merits and declaring that the judgment debt is not excepted from discharge.

Date: February 11, 2021

_____
Frank J. Bailey
United States Bankruptcy Judge